IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

KELVIN KEITH BIAS,                §
                                  §
            Plaintiff,            §
                                  §
v.                                §        CIVIL ACTION NO. G-07-0338
                                  §
HANJIN SHIPPING CO., LTD.,        §
et al.,                           §
                                  §
            Defendants.           §

**<u>MEMORANDUM OPINION AND ORDER</u>**

Pending before the court is Defendant Hanjin Shipping Co. Ltd.'s ("Hanjin") Motion for Summary Judgment (Docket Entry No. 39).  In response, plaintiff Kelvin Keith Bias filed Plaintiff's Response to Defendant, Hanjin Shipping Co. Ltd.'s, Motion to Dismiss and Motion for Summary Judgment (Docket Entry No. 46).  Hanjin then filed Defendant's Hanjin Shipping Co. Ltd.'s Reply to Plaintiff's Response to Hanjin's Motion for Summary Judgment (Docket Entry No. 49).  At the court's request, the parties have also filed Plaintiff's Supplemental Response to Defendant, Hanjin Shipping Co. Ltd.'s, Motion for Summary Judgment (Docket Entry No. 57), Plaintiff's Second Supplemental Response to Defendant, Hanjin Shipping Co. Ltd.'s, Motion for Summary Judgment (Docket Entry No. 60), and Hanjin's Brief Concerning Deposition of Crane Operator and Plaintiff's Recent Authority (Docket Entry

No. 61).  For the reasons stated below, Hanjin's motion for summary judgment will be granted.

## I.  **Background**

Kelvin Keith Bias was injured on the evening of either January 22, 2007, or January 23, 2007,[1] at the Port of Houston's Greensport Terminal[2] as he assisted in the process of unloading steel slabs[3] from the M/V Hanjin Calcutta ("Calcutta"),[4] a cargo ship owned and operated by defendant Hanjin.[5]  Bias was employed as a longshoreman by Gulf Stream Marine, Inc. ("Gulf Stream") at the time of the incident.[6]

---

[1]Videotaped Oral Deposition of Kelvin Keith Bias, at 163 (May 2, 2008) (included in Defendant Hanjin Shipping Co. Ltd.'s Motion for Summary Judgment, Docket Entry No. 39, at Exhibit J); Defendant Hanjin Shipping Co. Ltd.'s Motion for Summary Judgment, Docket Entry No. 39, at Exhibit F, Exhibit G; Plaintiff's Response to Defendant Hanjin Shipping Co., Ltd.'s Motion to Dismiss and Motion for Summary Judgment, Docket Entry No. 46, at Exhibit E, Exhibit H.

[2]Videotaped Oral Deposition of Kelvin Keith Bias, at 73; Defendant Hanjin Shipping Co. Ltd.'s Motion for Summary Judgment, Docket Entry No. 39, at Exhibit F.

[3]Videotaped Oral Deposition of Kelvin Keith Bias, at 73; Defendant Hanjin Shipping Co. Ltd.'s Motion for Summary Judgment, Docket Entry No. 39, at Exhibit F.

[4]Oral Videotaped Deposition of Jesus Loyde, at 14-15 (Oct. 17, 2008) (included in Defendant Hanjin Shipping Co. Ltd.'s Motion for Summary Judgment, Docket Entry No. 39, at Exhibit K).

[5]Defendant Hanjin Shipping Co. Ltd.'s Motion for Summary Judgment, Docket Entry No. 39, at 12.

[6]Videotaped Oral Deposition of Kelvin Keith Bias, at 57; Defendant Hanjin Shipping Co. Ltd.'s Motion for Summary Judgment, Docket Entry No. 39, at Exhibit F, Exhibit G, Exhibit H.

The steel slabs were unloaded from the <u>Calcutta</u> using the ship's four cranes.[7]  The crane involved in Bias' accident was operated by Felipe Rodriguez, another Gulf Stream employee.[8]  The crane would lift slabs, one at a time, from the hold of the ship and then lower them to the dock below where Bias and another Gulf Stream employee, Louis Redman, waited to manhandle them onto two steel beams.[9]  The slabs were placed onto the steel beams so that a forklift could easily pick them up and move them off of the dock.[10]  The surface below the beams was not level, so the beams did not sit flush on the dock when a slab was not resting on them.[11]  As a slab was lowered onto the beams, one of Bias' feet remained in

---

[7]Videotaped Oral Deposition of Kelvin Keith Bias, at 74; <u>see</u> Oral Videotaped Deposition of Jesus Loyde, at 47, 60; Oral Videotaped Deposition of Captain Hojin Park, at 20 (Oct. 23, 2008) (included in Plaintiff's Response to Defendant Hanjin Shipping Co., Ltd.'s Motion to Dismiss and Motion for Summary Judgment, Docket Entry No. 46, at Exhibit J).

[8]Oral and Videotaped Deposition of Felipe Rodriguez, at 9, 13, 15 (Feb. 28, 2009) (included in Plaintiff's Second Supplemental Response to Defendant, Hanjin Shipping Co. Ltd.'s, Motion for Summary Judgment, Docket Entry No. 60).

[9]Videotaped Oral Deposition of Kelvin Keith Bias, at 75-76, 86-92; Oral Videotaped Deposition of Jesus Loyde, at 29-30; Affidavit of Louis Redman (Jan. 27, 2009) (included in Plaintiff's Response to Defendant Hanjin Shipping Co., Ltd.'s Motion to Dismiss and Motion for Summary Judgment, Docket Entry No. 46, at Exhibit C).

[10]Videotaped Oral Deposition of Kelvin Keith Bias, at 75-76, 86-92; Affidavit of Louis Redman.

[11]Videotaped Oral Deposition of Kelvin Keith Bias, at 98-102; Oral Videotaped Deposition of Jesus Loyde, at 68-70; Defendant Hanjin Shipping Co. Ltd.'s Motion for Summary Judgment, Docket Entry No. 39, at Exhibit F.

the space between one of the beams and the dock.[12]  His foot was
crushed between the beam and dock when the full weight of the slab
-- over twenty tons[13] -- came to rest on the beams.[14]  Bias suffered
several broken bones and other severe injuries to his foot as a
result.[15]  Bias underwent multiple surgeries, and two of his toes
were amputated.[16]

Bias sued Hanjin alleging negligence under 33 U.S.C. § 905(b),
a provision of the Longshore and Harbor Worker's Compensation Act
("LHWCA").  Hanjin now moves for summary judgment.

## II.  <u>Summary Judgment Standard</u>

The court may grant summary judgment if the movant establishes
that there is no genuine dispute about any material fact and that

---

[12]Videotaped Oral Deposition of Kelvin Keith Bias, at 98-99,
110; Affidavit of Louis Redman; Defendant Hanjin Shipping Co.
Ltd.'s Motion for Summary Judgment, Docket Entry No. 39, at
Exhibit F, Exhibit G, Exhibit H.

[13]Oral Videotaped Deposition of Jesus Loyde, at 78; Oral and
Videotaped Deposition of Felipe Rodriguez, at 15 (Feb. 28, 2009)
(included in Plaintiff's Second Supplemental Response to Defendant,
Hanjin Shipping Co. Ltd.'s, Motion for Summary Judgment, Docket
Entry No. 60).

[14]Videotaped Oral Deposition of Kelvin Keith Bias, at 98-99,
110; Affidavit of Louis Redman; Defendant Hanjin Shipping Co.
Ltd.'s Motion for Summary Judgment, Docket Entry No. 39, at
Exhibit F, Exhibit G, Exhibit H.

[15]Videotaped Oral Deposition of Kelvin Keith Bias, at 114, 122-
24; Defendant Hanjin Shipping Co. Ltd.'s Motion for Summary
Judgment, Docket Entry No. 39, at Exhibit F, Exhibit H.

[16]Videotaped Oral Deposition of Kelvin Keith Bias, at 122-24.

it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  An examination of substantive law determines which facts are material.  Anderson v. Liberty Lobby, Inc., 106 S. Ct. 2505, 2510 (1986).  Material facts are those facts that "might affect the outcome of the suit under the governing law."  Id.  A genuine issue of material fact exists if the evidence is such that a reasonable trier of fact could resolve the dispute in the nonmoving party's favor.  Id. at 2511.

The movant has the initial burden to inform the court of the basis for summary judgment.  Celotex Corp. v. Catrett, 106 S. Ct. 2548, 2553 (1986).  To meet this initial burden the moving party need not submit affidavits or other evidence negating the non-moving party's claim.  Id.  Instead, the movant may satisfy its burden by pointing out that the pleadings, depositions, answers to interrogatories, admissions, or affidavits on file demonstrate that the plaintiff has failed to make a showing adequate to establish the existence of a genuine issue of material fact as to an essential element of his case.  Id. at 2552-53.

If the movant makes the required initial showings, the burden shifts to the nonmoving party to show by affidavits, depositions, answers to interrogatories, admissions, or other evidence that summary judgment is not warranted because genuine fact issues exist.  See id.  Conclusory allegations, unsubstantiated assertions, or a mere scintilla of evidence will not satisfy the

nonmovant's burden.  <u>Little v. Liquid Air Corp.</u>, 37 F.3d 1069, 1075 (5th Cir. 1994).  If the nonmovant fails to present specific evidence showing there is a genuine issue for trial, summary judgment is appropriate.  <u>Topalian v. Ehrman</u>, 954 F.2d 1125, 1132 (5th Cir. 1992).

In reviewing the evidence "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence."  <u>Reeves v. Sanderson Plumbing Prods. Inc.</u>, 120 S. Ct. 2097, 2110 (2000).  But if "critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant," summary judgment should be granted.  <u>Armstrong v. City of Dallas</u>, 997 F.2d 62, 67 (5th Cir. 1993).  Moreover, if there is an <u>absence</u> of evidence, the court will not "assume that the nonmoving party could or would prove the necessary facts."  <u>Little</u>, 37 F.3d at 1075 (citing <u>Lujan v. National Wildlife Fed'n</u>, 110 S. Ct. 3177, 3188 (1990)).

### III.  <u>Analysis</u>

**A.  Negligence Under § 905(b)**

Section 905(b) of the LHWCA provides longshoremen and certain other persons a cause of action against a shipowner to recover for injuries "caused by the negligence of a vessel . . . ."  33 U.S.C. § 905(b).  Interpreting this section, the Supreme Court has identified three limited duties owed by shipowners to longshoremen:

-6-

(1) the "turnover duty," (2) the "active control" duty, and (3) the "duty to intervene." Howlett v. Birkdale, 114 S. Ct. 2057, 2063 (1994); see also Scindia Steam Navigation Co. v. De los Santos, 101 S. Ct. 1614, 1622-23 (1981). A breach of one of these duties is actionable only if it is a "legal cause" of the longshoreman's injury; that is the breach of a duty must have been a "substantial factor" in the injury. Moore v. M/V Angela, 353 F.3d 376, 383 (5th Cir. 2003); Donaghey v. ODECO, 974 F.2d 646, 649 (5th Cir. 1992).

Bias contends that Hanjin violated all three duties, resulting in his injury. The court therefore considers whether there is sufficient evidence in the record to establish a genuine issue of material fact as to whether Hanjin breached any of the three duties, and thereby caused Bias' injury.

**B.  The Turnover Duty**

The turnover duty requires a shipowner to exercise ordinary care to turn over the ship, its equipment, and appliances to a stevedore contractor "'in such condition that an expert and experienced stevedoring contractor . . . will be able by the exercise of ordinary care' to carry on cargo operations 'with reasonable safety to persons and property.'" Howlett, 114 S. Ct. at 2063 (quoting Fed. Marine Terminals, Inc. v. Burnside Shipping Co., 89 S. Ct. 1144, 1151 n.18 (1969)). The duty further requires a shipowner to warn a stevedoring contractor of any non-obvious hazard on the ship or with respect to the ship's equipment if the

-7-

shipowner knows of the hazard or should know of the hazard through the exercise of reasonable care.  Id. (citing Scindia Steam, 101 S. Ct. at 1622).

Bias contends that evidence in the record suggests that Hanjin violated the turnover duty by turning the ship over to Gulf Stream in an unreasonably safe condition because one of the cranes was malfunctioning and/or by failing to warn Gulf Stream of the crane malfunction.  Specifically, Bias asserts that the evidence tends to show that the crane that was lowering the slab that crushed his foot was not working correctly, causing the load to come down prematurely before he could move his foot out from beneath the beam.  He further asserts that had Gulf Stream been warned of the crane malfunction, it could have taken additional safety precautions that could have prevented Bias' injury.  See Moore, 353 F.3d at 381-83 (finding that a shipowner's failure to warn a stevedore of a latent crane defect was a breach of the turnover duty and that this breach caused the plaintiff's injury, in part, because the stevedore "would have conducted its operations differently" had it been warned of the danger).

Bias testified in his deposition that his foot was crushed beneath the beam because the steel slab came down "too fast," before he was ready.[17]  He said that he had heard earlier that day

---

[17]Videotaped Oral Deposition of Kelvin Keith Bias, at 169-70, 182-83.

from other workers that the crane involved in his accident "wasn't lifting right," and that "it was getting jammed and it wasn't . . . working properly."[18]   He speculated that this crane malfunction could have been a cause of his injury, but also admitted that it was equally likely that the slab came down before he was ready because the crane operator lowered it too soon.[19]

A note in the records kept by Richardson Steel Yard, another stevedoring company that was involved in unloading the Calcutta, suggests that on January 21, a day or two before Bias was injured, unloading operations on hatch number four were halted for less than an hour because the ship's crane servicing that hatch was down.[20] The captain of the Calcutta, Hojin Park, confirmed this information in his deposition.   Captain Park testified that the number four crane on the Calcutta experienced a problem on January 21.[21]   He explained that the joystick, which the operator used to control the crane, was sticking.[22]   This caused the crane to jerk, rather than move smoothly, in its slewing motion.[23]   Captain Park testified that

---

[18]Id. at 178-81.

[19]Id. at 183.

[20]Plaintiff's Response to Defendant Hanjin Shipping Co., Ltd.'s Motion to Dismiss and Motion for Summary Judgment, Docket Entry No. 46, at Exhibit B, p. 6.

[21]Oral Videotaped Deposition of Captain Hojin Park, at 22.

[22]Id. at 23-26.

[23]Id.  Captain Park described the crane's slewing motion as its left-to-right motion.  See id.

unloading operations were temporarily halted, and that the joystick was lubricated.  The lubrication of the joystick fixed the problem and the crane returned to normal operation.[24]  Captain Park further stated that no other problems with any of the <u>Calcutta</u>'s cranes were reported during the unloading operation,[25] nor does any other evidence in the record suggest that there were any further crane problems during the course of the unloading operation.  Felipe Rodriguez, who was operating the crane involved in Bias' accident at the time the accident occurred, testified that the crane was working properly on the day Bias was injured.[26]

Jesus Loyde, who was the supervisor for Gulf Stream's stevedore crew at the time of Bias' injury, testified that he was never told that the crane had been having problems.[27]  He stated that had he been informed that the crane had been experiencing problems, he would have "looked into it."[28]

Even assuming <u>arguendo</u> that turning the ship over to Gulf Stream with a malfunctioning crane and/or without warning Gulf

---

[24]<u>Id.</u>

[25]<u>Id.</u> at 26.

[26]Oral and Videotaped Deposition of Felipe Rodriguez, at 65.

[27]Oral Videotaped Deposition of Jesus Loyde, at 82-83.  This directly contradicts Bias' testimony that Loyde was one of the people who told him about the crane problems.  <u>See</u> Videotaped Oral Deposition of Kelvin Keith Bias, at 179.  Viewing the evidence in the light most favorable to Bias, however, the court assumes that neither Loyde nor anyone else with Gulf Stream was warned by Hanjin about the earlier crane malfunction.

[28]Oral Videotaped Deposition of Jesus Loyde, at 82-83.

Stream about the crane malfunction amounts to a violation of the turnover duty, this evidence is insufficient to create a genuine issue of material fact as to whether the crane malfunction was a "substantial factor" in Bias' injury.  Moore, 353 F.3d at 383.

Viewing the credible evidence in the light most favorable to Bias, it establishes only that one of the Calcutta's cranes experienced a problem a day or two before Bias was injured.[29]  The problem affected only the crane's slewing motion and was unrelated to the crane's lifting or descending motion.  Bias' unsubstantiated and inadmissible hearsay testimony suggesting that the crane was malfunctioning on the day of his injury and that the crane's lifting functionality was affected may not be given any credence.  See Fowler v. Smith, 68 F.3d 124, 126 (5th Cir. 1995) ("Evidence on summary judgment may be considered to the extent not based on hearsay . . . .").

A crane malfunction involving only the crane's slewing motion that occurred one or two days before Bias was injured could not possibly have caused the slab that actually injured Bias to come down too fast to enable him to remove his foot from beneath the beam.  Bias' pure speculation that the crane may have contributed to his injury fails to create a genuine issue of fact.  See Little,

---

[29]There is conflicting evidence in the record as to which hatch Bias was working to unload when he was injured.  Therefore, it is not clear whether Bias was unloading a hatch serviced by the crane that had been experiencing problems.  But viewing the evidence in the light most favorable to Bias, the court assumes that the crane involved in Bias' accident was the same crane.

37 F.3d at 1078-79 (holding that evidence that does not "suggest which of [several] speculative [causation] theories . . . is most plausible" is insufficient to create a genuine issue of material fact).

Moreover, the evidence shows only that had Gulf Stream been told about the crane problem Loyde would have "looked into it." There is no evidence in the record suggesting how, if at all, Gulf Stream would have actually altered its unloading operations had it been informed. See id. at 1075 ("We do not . . . in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts."). Therefore, there are no genuine fact issues for trial with regard to the turnover duty.

**C.  The Active Control Duty**

Under the active control duty the shipowner can be held liable if it actively participates in the stevedoring operations and negligently injures a longshoreman. Scindia Steam, 101 S. Ct. at 1622.  The active control duty also requires the shipowner to "exercise due care to avoid exposing longshoremen to harm from hazards they may encounter in areas, or from equipment, under the active control of the vessel during the stevedoring operation." Id.

Bias does not allege that Hanjin actively participated in the stevedoring operation or that he was injured in an area under the active control of the vessel.  Instead, he contends that equipment under the active control of the vessel caused his injury.

-12-

Bias testified that it was dark on the dock the evening that he was injured, so he complained to Loyde, his supervisor, about the darkness.[30]   Bias stated that although he does not remember seeing Loyde going onto the ship, he believes Loyde then asked the ship's crew to provide lights.[31]   According to Bias, after he notified Loyde about the darkness, he saw the crew of the ship rigging some lights to the structure of the ship to provide light on the dock where Bias was working.[32]   He testified that these lights were inadequate and that the lighting on the dock remained poor.[33]   Bias suggested that the darkness was a cause of his injury.[34]   Based on this testimony, Bias argues that his injury was caused by a breach of the active control duty because the inadequate lights mounted on the <u>Calcutta</u> were equipment under the active control of the vessel.

As Hanjin points out, courts have consistently held that a vessel owner has no duty to provide adequate lighting for longshoremen.   <u>See, e.g.</u>, <u>Lipari v. Kawasaki Kisen Kaisha, Ltd.</u>, No. 89-16229, 1991 WL 3060, *2 (9th Cir. Jan. 11, 1991) ("[G]enerally speaking, responsibilities for lighting the work area fall upon the stevedore and not the shipowner."); <u>Wright v. Gulf</u>

---

[30]Videotaped Oral Deposition of Kelvin Keith Bias, at 172-73.

[31]<u>Id.</u> at 172-76.

[32]<u>Id.</u> at 173-76.

[33]<u>See</u> <u>id.</u> at 96, 141-42, 172-73.

[34]<u>See</u> <u>id.</u> at 96, 117-18, 135.

Coast Dockside, Inc., No. 97-2745, 1998 WL 334851, *3 (E.D. La. June 23, 1998) (holding that the shipowner "was entitled to rely on [the stevedore] to provide adequate lighting"); Ryan-Walsh, Inc. v. Maritima Aragua, S.A., No. 92-3662, 1994 WL 247217, *3 (E.D. La. June 2, 1994) (explaining that "it is the stevedoring company's responsibility," not the shipowner's, to provide adequate lighting); McCullough v. S/S Coppename, No. 75-2440, 1983 AMC 2547, (E.D. La. Apr. 23, 1982) ("[T]he stevedoring company that employs the longshoreman, not the shipowner, is required by statute and regulation . . . to protect the longshoreman from the danger of poor lighting." (citation omitted)).  This is because § 941 of the LHWCA and the regulations promulgated thereunder place this duty squarely on the stevedore who employs the longshoremen.  See 33 U.S.C. § 941(a) (providing that the "employer shall furnish and maintain employment and places of employment which shall be reasonably safe for his employees in all employment covered by this chapter" (emphasis added)); 29 C.F.R. § 1917.123 ("Working and walking areas shall be illuminated."); 29 C.F.R. § 1918.92 ("Walking, working, and climbing areas shall be illuminated."); Scindia Steam, 101 S. Ct. at 1626-27 ("The statutory duty of the stevedore under § 941 to provide a safe place to work has been implemented by the Safety and Health Regulations for Longshoring. 29 CFR § 1918.1 et seq." (emphasis added)).[35]

---

[35]Because Bias was working on the dock, and not on the vessel, the illumination standards found in 29 C.F.R. § 1917.123 probably
(continued...)

Bias seeks to circumvent this well established principle by disguising the duty to provide adequate lighting as the active control duty.  The court is not persuaded.  As another district court faced with an identical argument explained,

> [i]t may be true that the lights on the ship remained in the control of the shipowner.  But the lighting in that area [where the plaintiff longshoreman was working] did not remain in the control of the shipowner.  Even accepting as true the plaintiff's deposition testimony that it was dark and shadowy in the corner where he fell, . . . that evidence cannot support a finding that the shipowner was negligent, because it is the duty of the stevedore, not the shipowner, to provide adequate lighting.

Landsem v. Isuzu Motors, Ltd., 534 F. Supp. 448, 451 (D. Ore. 1982).  See also Matthews v. Pan Ocean Shipping Co., Ltd., No. 91-0069, 1992 WL 59158, *1-2 (E.D. Pa. March 19, 1992) (adopting the analysis from Landsem and concluding that the shipowner owed no duty to provide adequate lighting for the longshoreman plaintiff even though "[t]he ship's crew moved lights to areas of active operations, and no other lighting was provided").  As the Fifth Circuit has explained, allowing Bias "to foist the duty of complying with these health and safety regulations upon the

---

[35](...continued)
apply instead of the standards found in § 1918.92.  See 29 C.F.R. § 1917.1(a) ("The regulations of this part apply to employment within a marine terminal . . . including the loading, unloading, movement or other handling of cargo, ship's stores or gear within the terminal . . . ."); 29 U.S.C. § 1918.1(a) ("The regulations of this part apply to longshoring operations and related employments aboard vessels." (emphasis added)).  Regardless of which regulation applies, however, both are promulgated under the authority of 33 U.S.C. § 941, which clearly places the responsibility for compliance on the stevedore, not the vessel.

shipowner [would] employ exactly the type of liability without fault concept from which Congress sought to free vessels by the passage of the 1972 Amendments [to the LHWCA]." <u>Brown v. Mitsubishi Shintaku Ginko</u>, 550 F.2d 331, 333 (5th Cir. 1977) (internal quotation marks and citation omitted).  Furthermore, adopting Bias' legal theory would perversely encourage shipowners to shut off all lighting attached to the ship since they would be better off providing no light whatsoever, rather than risk liability by providing some light -- which might not be adequate -- and triggering the active control duty.  As a matter of law, Bias cannot recover on the basis of the active control duty.[36]

## D.   The Duty to Intervene

The duty to intervene "concerns the vessel's obligations with regard to cargo operations in areas under the principal control of

---

[36]Bias cites <u>Masinter v. Tenneco Oil Co.</u>, 867 F.2d 892 (5th Cir. 892), for the proposition that stevedores are not always responsible for providing adequate lighting and that the vessel has that duty if it maintains control of the lighting.  <u>See</u> Plaintiff's Supplemental Response to Defendant, Hanjin Shipping Co. Ltd.'s, Motion for Summary Judgment, Docket Entry No. 57, at 4.  Bias, however, misinterprets <u>Masinter</u>.  In <u>Masinter</u> the Fifth Circuit did conclude that the vessel was liable to the plaintiff under the active control duty, in part because it negligently failed to provide adequate lighting.  <u>See Masinter</u>, 867 F.2d at 897-98.  The court reached this conclusion, however, because the vessel owner was "<u>contractually bound</u>" to remain in control of the vessel, and therefore had a "continuing duty of care to those aboard the vessel." <u>Id.</u> at 897.  Thus, the vessel owner had a duty to the plaintiff because the plaintiff was injured in an <u>area</u> under the active control of the vessel, not because the vessel retained active control of the lights themselves.  <u>See id.</u> at 897-98. <u>Masinter</u> does not establish that a shipowner is responsible for providing adequate lighting in an area controlled by a stevedore just because the vessel maintains control over lights that happen to shine into that area.

the independent stevedore." <u>Howlett</u>, 114 S. Ct. at 98.  In such areas the shipowner has no duty "to take reasonable steps to discover and correct dangerous conditions that develop during the loading or unloading process." <u>Scindia Steam</u>, 101 S. Ct. at 1623. The shipowner may generally rely on the stevedore to ensure that cargo transfer operations are conducted safely.  <u>Id.</u>  If, however, the vessel owner has <u>actual</u> knowledge (1) that a hazard exists, (2) that the hazard poses an unreasonable risk of harm, (3) "that the stevedore, in the exercise of 'obviously improvident' judgment, means to work on in the face of it and therefore cannot be relied on to remedy it," the shipowner must intervene.  <u>Randolph v. Laeisz</u>, 896 F.2d 964, 970-971 (5th Cir. 1990) (quoting <u>Masinter v. Tenneco</u>, 867 F.2d 892, 897 (5th Cir. 1989)).  <u>See also</u> <u>Greenwood v. Societe Francaise De</u>, 111 F.3d 1239, 1248 (5th Cir. 1997); <u>Woods v. Sammisa Co., Ltd.</u>, 873 F.2d 842, 852-53 (5th Cir. 1989), <u>abrogated on other grounds by</u> <u>Kirksey v. Tonghai Maritime</u>, 535 F.3d 388, 396 (5th Cir. 2008).

Bias asserts that because there is evidence in the record that the vessel owner was notified of the dark conditions on the dock, and that it responded by mounting lights on the ship to illuminate the work area, there is at least a fact issue as to whether the shipowner had actual knowledge of the hazard and that the stevedore intended to continue work in the face of the hazard.  Further, Bias contends that whether the shipowner knew that the darkness presented an unreasonably dangerous condition and whether the

stevedore's decision to continue work in the darkness was obviously improvident are fact questions for the jury.

The court does not agree with Bias' interpretation of the evidence in the record.  Specifically, Bias has not pointed to any evidence suggesting that Hanjin knew that Gulf Stream would order its workers to resume working without first providing adequate lighting.

Bias testified that Hanjin was made aware of the lack of adequate illumination on the dock where Bias was working.[37] Further, he testified that members of the ship's crew, presumably Hanjin employees, responded by affixing lights to the Calcutta to illuminate Bias' work area on the dock.[38]  Bias explained that Loyde, his supervisor, instructed Bias' crew of longshoremen to cease working while the lights were being affixed, and that they did not resume working until after the lights had been attached to the ship.[39]  Bias testified that even after the lights were attached, it remained too dark on the dock.[40]

This evidence tends to show only that Hanjin was put on notice of the hazardous condition and perhaps, viewing the evidence in the light most favorable to Bias, that Hanjin knew that the darkness

---

[37]Videotaped Oral Deposition of Kelvin Keith Bias, at 172-76.

[38]Id. at 173-76.

[39]Id. at 173-77, 185-87.

[40]See id. at 96, 141-42, 172-73.

posed an unreasonable risk of harm. The evidence may even support an inference that Hanjin employees observed and recognized that the lights they affixed to the ship did not remedy the dangerous condition.

Lacking, however, is any evidence that Hanjin employees knew or observed that Gulf Stream ordered or would order its employees back to work in the dangerous condition. See Futo v. Lykes Bros. Steamship Co., Inc., 742 F.2d 209, 220 (5th Cir. 1984) (explaining that the "critical" issue was "whether or not any [shipowner] employee actually saw a [stevedore] employee working on the [unreasonably dangerous] scaffold, and concluding that there was no evidence in the record indicating that "the [shipowner's] employees knew that the [stevedore's] employees were working or would work under this condition"). The court cannot presume that just because there were Hanjin employees on the ship or in the area that they actually observed Gulf Stream employees resuming work in the inadequately lit area. See id. ("Mere presence of [the ship-owner's] employees on the vessel and even their knowledge of the [unreasonably dangerous] condition . . . itself are simply not enough."). Such a presumption would amount to a "speculative leap." Id.; see also Little, 37 F.3d at 1075 ("We do not . . . in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts).

Further, no evidence suggests that Hanjin employees knew that they could not rely on Gulf Stream to take further steps, if

-19-

necessary, to provide adequate illumination.[41]  See Greenwood, 111
F.3d at 1248 (explaining that shipowner must have "actual knowledge
that it could not rely on the stevedore to protect its employees").
Moreover, Hanjin had no duty to monitor Gulf Stream to ensure that
it did not put its employees back to work without first providing
sufficient light.   See Scindia Steam, 101 S. Ct. at 1623
(explaining that the shipowner has no duty "to take reasonable
steps to discover . . . dangerous conditions," or to "oversee the
stevedore's activity").

    Bias has failed to point to evidence in the record sufficient to
create a genuine issue of material fact as to whether Hanjin's duty
to intervene was triggered.[42]  Hanjin is entitled to summary judgment.

_____

    [41]This is particularly true here because, as discussed above,
regulations promulgated under the LHWCA explicitly require the
stevedore to provide adequate lighting.  See 29 C.F.R. § 1917.123;
29 C.F.R. § 1918.92.  See also Landsem, 534 F. Supp. at 451 ("[T]he
duties imposed on the stevedore by law and the shipowner's
justifiable expectation that they will be met are relevant to
determining whether the shipowner has breached its duty.").

    [42]The court is not persuaded by the authority provided by Bias
in his Supplemental Response to Defendant, Hanjin Shipping Co.
Ltd.'s, Motion for Summary Judgment (Docket Entry No. 57).  Two of
the six cases cited clearly support the proposition that the duty to
intervene is not triggered absent a showing by the plaintiff that the
vessel owner had actual knowledge that the stevedore would proceed in
the face of the unreasonably dangerous condition and could not be
relied upon to ensure that the work environment was safe for its
longshoreman employees.  Gay v. Barge 266, 915 F.2d 1007, 1012 (5th
Cir. 1990); Randolf, 896 F.2d at 970.  Therefore, to the extent these
cases reach a different result, they can be distinguished on the
fact.  Turner v. Costa Line Cargo Servs., Inc., 744 F.2d 505, 510-11
& n.9 (5th Cir. 1984), and LeBlanc v. United States, 732 F. Supp.
709, 715-16 (E.D. Tex. 1990), suggest that the plaintiff may not need
to show that the vessel owner actually knew that the stevedore would
                                                    (continued...)

## IV.  Conclusion and Order

Based on the foregoing analysis, Defendant Hanjin Shipping Co. Ltd.'s Motion for Summary Judgment (Docket Entry No. 39) is **GRANTED.**

**SIGNED** at Houston, Texas, on this 18th day of March, 2009.

SIM LAKE
UNITED STATES DISTRICT JUDGE

---

[42](...continued)
work on in the face of the unreasonably dangerous condition, but only that the vessel owner actually knew the stevedore could not be relied upon to ensure that the work environment was safe for its longshoreman employees.  Even if these two cases correctly recite the law, Bias has not presented any evidence suggesting that Hanjin knew that Gulf Stream would not fulfil its responsibility to ensure that its employees had adequate light.  Ponce v. M/V Altair, 493 F. Supp. 2d 880, 892-93 (S.D. Tex. 2007), is not consistent with Fifth Circuit precedent.  The Ponce court concluded that the duty to intervene applied based on a finding that the vessel owner "did or should have recognized the risk," and did not require the plaintiff to show that the vessel owner had actual knowledge of the dangerous condition. Id. at 892.  Further, the court in Ponce did not require the plaintiff to show that the vessel owner had actual knowledge that the stevedore would work on in the face of the dangerous condition and could not be relied upon to remedy the dangerous condition, allowing the plaintiff instead to show only that the stevedore was unlikely to recognize the dangerous condition, and implying that the vessel owner should have known this.  Id. at 892-93.  Finally, in Masinter v. Tenneco Oil Co., 867 F.2d 892 (5th Cir. 1989), the court concluded the vessel owner was liable based only on the active control duty. Therefore, the holding did not involve the duty to intervene and provides no guidance for applying it.

-21-